UNITED STATES DISTRICT COURT
for the
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PAUL J. TANNER** | \* Jury Demand |
| | \* |
| **VERSUS** | \* Civil Action No.17-5141 |
| | \* |
| **BD LAPLACE, LLC** | \* |

# COMPLAINT

**NOW INTO COURT,** comes Plaintiff Paul J. Tanner who states his complaint against Defendant BD LaPlace, LLC. as follows.

### PARTIES

1. Plaintiff, Paul J. Tanner, was a 54-year-old living in Gonzales, Louisiana and was Defendant's employee at the time of the events of this lawsuit. Tanner was an employee as defined by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111(4).

2. Previous names of Defendant BD Laplace, LLC are ArcelorMittal LaPlace, LLC; Bayou Steel, LLC; and Bayou Steel Corporation.

3. BD LaPlace, LLC is a covered entity and an employer as defined by the ADA, 42 U.S.C. § 12111(2) and (5).

4. Mr. Tanner worked at BD LaPlace, LLC, a steel mill, in LaPlace, Louisiana (St. John the Baptist parish) from June 2006 to March 4, 2016.

5. During that time the company was registered with the Louisiana Secretary of State as either ArcelorMittal LaPlace, LLC; Bayou Steel, LLC; or Bayou Steel Corporation.

6. BD LaPlace, LLC bought the assets of ArcelorMittal LaPlace, LLC (ArcelorMittal, hereafter) in 2016 and renamed it BD LaPlace, LLC.

7. Employer liability arising from an ADA violation occurring when the steel mill was ArcelorMittal LaPlace belongs to its successor company, BD LaPlace, LLC (BD LaPlace, hereafter).

## JURISDICTION AND VENUE

8. This is an action brought against Defendant BD LaPlace's (for its predecessor company, ArcelorMittal LaPlace) violations of the ADA and the Louisiana Wage Payment Act (La. R.S. 23:631-634).

9. Federal subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 in that Plaintiff's claims involve federal questions arising from the ADA.

10. Venue is appropriate in this Court as the events giving rise to this cause of action occurred within the Eastern District of Louisiana.

## GENERAL ALLEGATIONS

11. Bayou Steel Corporation hired Paul Tanner in June 2006. Most recently, Tanner worked as a crane operator.

12. Paul Tanner at all times satisfactorily performed his job duties with Defendant and its predecessor companies.

13. On February 10, 2016, Tanner received a letter from ArcelorMittal suspending him from work because he was "being referred to the Company's employee assistance program for a mandatory fitness for duty evaluation". Ex. 1.

14. ArcelorMittal promised to end Tanner's suspension when he passed the evaluation. Tanner refused to take the evaluation and asked that his union first review the request. Ex. 1.

15. Under a collective bargaining agreement between ArcelorMittal and the United

Steelworkers in various cities in Indiana; Ohio, Pennsylvania, South Carolina, and West Virginia (9/1/2012), the employee assistance program (EAP) is a voluntary program for an employee unless there is reasonable cause, based on objective evidence, to believe that the employee is legally intoxicated or impaired by drugs on the job.

16. In the same agreement, EAP is described as one established to facilitate the rehabilitation of employees afflicted with alcoholism or drug abuse.

17. ArcelorMittal directed Paul Tanner to report the next day to Hidalgo Health Associates in Baton Rouge and, the day after that, to CDC Associates in Baton Rouge.

18. ArcelorMittal told Tanner to provide the clinics with all his medical and mental health records.

19. Hidalgo Health Associates describes the key functions of EAP "is to provide short-term counseling, crisis management, and to serve as a bridge between the troubled employee and public and private resources for longer term needs."
sales.healthassociatesllc.com/poc/view_doc.php?type=doc&id=59122

20. CDC Associates provides psychological testing, psychotherapy, neuropsychological testing, and behavior modification. www.healthgrades.com

21. The exam at CDC Associates would start at 9 am, take most of the day requiring Tanner to pack a lunch, and he could not have visitors during the evaluation. Ex. 1 (*see* last page of exhibit).

22. ArcelorMittal did not provide Tanner a job-related or a business-necessity reason for why he should undergo physical and mental medical evaluations.

23. ArcelorMittal described the test as a "behavioral assessment". Ex. 7.

24. When Tanner had been hurt at work in 2008, ArcelorMittal sent him to a doctor in LaPlace for a functional capacity evaluation. ArcelorMittal often sent job applicants and employees to LaPlace doctors and not to clinics in Baton Rouge.

25. On February 11, 2016, Tanner visited Hidalgo Health Associates and CDC Associates. He told them to cancel any appointment for him that ArcelorMittal had made.

26. Tanner gave Hidalgo Health Associates and CDC Associates each a letter stating that he refuse to take part in the EAP. Ex. 2. He asked each clinic to forward a copy of the letter to ArcelorMittal.

27. In that letter, addressed to ArcelorMittal's Human Resources department, Paul Tanner stated that he could not undergo any EAP evaluations explaining that EAP is a voluntary program for alcohol and drug abuse, he had not volunteered for EAP, there had been no job-performance complaints against him, he had no job-performance problems, and that he saw no reason to participate. Ex. 2.

28. Tanner had been told by company personnel at its plant gates that he would never work there again. Tanner also figured that since had refused to undergo the company required testing, he had been fired or he would be on unpaid leave.

29. On February 12, 2016, Paul Tanner received a letter from ArcelorMittal stating that its request he undergo a fitness for duty evaluation "is a mandatory request and by choosing not to participate you may be jeopardizing your employment." Ex. 3.

30. ArcelorMittal also reminded Tanner that he was required to provide the clinic all his medical and mental health records for the evaluation. Ex. 3.

31. Tanner faxed ArcelorMittal Human Resources on February 16, 2016 requesting

documentation to justify an EAP and a mental-health assessment. Ex. 4.

32. On February 18, 2016, ArcelorMittal provided Tanner several company policies from an employee handbook, but none contained reasons justifying the Company's demand for testing him. Ex. 5 (*see* cover letter).

33. The Company repeated to Tanner that it was a "mandatory request and by choosing not to participate you may be jeopardizing your employment with ArcelorMittal LaPlace, LLC."

34. On February 22, 2016, ArcelorMittal asked Tanner for "suggestions that would allow the Company to confirm that you are fit for duty" whereupon his suspension could end. Ex. 6.

35. ArcelorMittal provided Tanner no reasons why it thought or suspected that he was unfit for duty.

36. ArcelorMittal had suspended Tanner until Tanner could prove he was fit to work despite no evidence he was unfit for work or that he posed a direct threat to himself or others. ArcelorMittal regarded Tanner so unfit to work because of his physical or mental attributes that it regarded Tanner unable to work at ArcelorMittal.

37. On March 1, 2016, Paul Tanner had a phone meeting with ArcelorMittal's HR representative, Kristen Barney, and his union's representative, Kinley Porter.

38. At the meeting, Paul Tanner refused to agree to take a mental-health behavioral examination.

39. Paul Tanner, under threat of adverse job action, offered to see a general practitioner for a routine pre-hire, job-fitness examination regarding the existing physical restrictions he already has in place.

40. ArcelorMittal's Kristen Barney told Tanner that his suggested examination would not be

sufficient and demanded that he submit to a behavioral examination.

41. Paul Tanner again requested ArcelorMittal to provide him job performance or behavioral complaints that would have justified its demand for a behavioral examination.

42. ArcelorMittal could not produce any such information or documentation.

43. After the meeting, Paul Tanner texted Kinley Porter, his union president, and informed him he could get a physical examination as early as March 4, 2016.

44. The union did not respond.

45. On March 3, 2016, Paul Tanner set up an appointment with a physician at CoreHealth Family Walk-in Clinic in Baton Rouge for a routine job-fitness examination.

46. On the same day, ArcelorMittal contacted Tanner by phone and letter telling him that the physical exam with a general practitioner that he proposed was insufficient to the company's demands. Ex. 7.

47. ArcelorMittal wrote that if Tanner did not undergo physical and behavioral assessments scheduled for March 4, 2016 with the company-approved doctor at Core Occupational (oversees CoreHealth clinic), ArcelorMittal considered Tanner as having "abandoned [his] employment and [would] process [his] termination as a voluntary resignation." Ex. 7.

48. On March 4, 2016, Tanner received a physical and wellness examination at CoreHealth at his own expense.

49. Paul Tanner's examination was conducted by a physician different from whom ArcelorMittal had demanded.

50. The physician, Dr. James Bellone, wrote that "Mr. Tanner is in good physical condition and is cleared to return to work with no limitations/restrictions. He is behaving appropriately."

Ex. 8.

51. Paul Tanner provided ArcelorMittal the doctor's evaluation.

52. Paul Tanner repeatedly requested ArcelorMittal to provide him reasons why he must undergo a psychological examination, but ArcelorMittal never responded.

53. Mr. Tanner received a letter on March 7, 2016, from ArcelorMittal informing him that it had "processed [Tanner's] release as a voluntary resignation for job abandonment effective March 4, 2016."

54. Paul Tanner requested assistance from his union in addressing the examination.

55. Tanner's union told him that he was required to submit to the unlawful examination.

56. ArcelorMittal falsely informed the Louisiana Workforce Commission that Tanner had voluntarily resigned from ArcelorMittal. Ex. 9

57. ArcelorMittal's false report to the Louisiana Workforce Commission delayed Tanner's receipt of unemployment benefits.

58. On or about July 8, 2016, Paul Tanner filed a complaint with the United States Equal Employment Opportunity Commission asserting disability discrimination and retaliation.

59. Tanner asserted that ArcelorMittal violated the Americans with Disabilities Act by making him agree to submit to a mental-health examination that was not job-related and was not consistent with business necessity.

60. Paul Tanner further asserted that because he refused to undergo the illegal testing, ArcelorMittal terminated his employment for that refusal.

61. On February 27, 2017, the EEOC issued Tanner a right to sue letter relating to his complaints of discrimination under the ADA. Ex. 10.

62. Paul Tanner filed this action within the 90-day period permitted under federal law, 42 U.S.C. § 2000e-5(f).

## COUNT 1
## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
### Defendant's Violation Regarding Medical Examinations

63. Paul Tanner incorporates by reference paragraphs 1 through 56 as fully set forth herein.

64. The ADA prohibits employers from demanding employees undergo medical examinations unless such examinations are shown to be "job related and consistent with business necessity." 42 U.S.C. §12112(d)(4); 29 C.F.R. §1630.14.

65. The ADA prohibits an employer from making inquiries as to whether an employee is an individual with a disability, unless such inquiry is shown to be job related and consistent with business necessity. 42 U.S.C. §12112(d)(4).

66. The EEOC has issued guidance on whether medical examinations and inquiries are "job related." See *EEOC Enforcement Guidance on Disability Related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act*, No. 915.002, 7/27/2000; www.eeoc.gov/policy/docs/guidance-inquiries.html.

67. Before an employer can require an employee to submit to a medical or psychological examination, the employer must have a reasonable belief, based on objective evidence, that the employee will be unable to perform the essential functions of his job or that the employee will pose a direct threat.

68  Medical or psychological inquiries must be "job-related and consistent with business necessity" unless otherwise permitted by the ADA (permitted inquiries such

as "how are you" or "how did you break your leg" or "have you been drinking").

69. The ADA protects employees from adverse employment actions stemming from their refusal to submit to medical inquiries and/or medical or psychological exams that are prohibited by the ADA, whether or not they are "persons with a disability."

70. ArcelorMittal (or as it is known now, BD LaPlace) violated the ADA by engaging in the following conduct:

  a. Requiring Paul Tanner to undergo psychological examinations, counseling and inquiries that were neither job related or consistent with medical necessity and not otherwise allowed under the ADA.

  b. Requiring Paul Tanner to provide his medical records and mental health records for purposes of evaluation.

  c. Requiring Paul Tanner to authorize the release of his medical and mental health records from the proposed medical examinations to ArcelorMittal.

  d. Compelling Paul Tanner, upon penalty of the loss of his job, to participate in the medical and psychological examinations.

  e. Terminating Tanner's employment because he refused to participate in the unlawful medical and psychological examinations and inquiries.

### COUNT II
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
Retaliation for Plaintiff's Refusal to Submit to an Unlawful Examination

71. Paul Tanner incorporates by reference paragraphs 1 through 65 as fully set forth herein.

72. The ADA prohibits an employer from "discriminating against any individual because such individual has opposed any act or practice made unlawful by the ADA..." 42 U.S.C. §12203(a).

73. Paul Tanner engaged in protected opposition when he refused to submit to the medical and psychological examinations that were unlawful under the ADA.

74. BD LaPlace terminated Paul Tanner because he refused to submit to the unlawful medical and psychological examinations that BD LaPlace demanded of him.

75. A causal connection exists between Tanner's protected activity and his termination by Defendant because Defendant's communications with him stated that he was compelled to participate in medical examinations, both physical and mental, as a condition to his continued employment.

## COUNT III
## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
### Defendant's Disability Discrimination

76. Paul Tanner incorporates by reference paragraphs 1 through 70 as fully set forth herein.

77. The ADA prohibits an employer from discriminating against an employee who can fulfill the essential functions of his job because the employer regards the employee as disabled.

78. Paul Tanner had the education, training, skills and experience necessary to perform the essential functions of his employment position.

79. ArcelorMittal suspended Tanner until Tanner could prove he was fit to work despite the fact that there was no evidence that Tanner was unfit to work. The company, also, had no evidence that Tanner could not perform the essential functions of his job, or that Tanner posed a direct threat to the company.

80. ArcelorMittal discriminated against Paul Tanner because it regarded Tanner

so disabled that it thought he was unable to do the essential functions of his job and, thereby, prevented Tanner from working.

## COUNT IV
## VIOLATION OF THE LOUISIANA WAGE PAYMENT ACT

81. Mr. Tanner remained on paid leave until his termination on March 4, 2016.

82. The company once gave its employees bonuses. Upon information and belief, BD LaPlace started the program again in 2016 paying employees for past work each quarter. BD LaPlace issued Tanner a $1,000 bonus check for his first-quarter bonus on May 6, 2016. Ex. 11. Mr. Tanner tried cashing the check but the company had issued a stop payment to the bank on that check.

83. Mr. Tanner worked 63 of the 90 days of the first quarter of 2016 at ArcelorMittal (worked until 3/4 instead of 3/31/2016). The company should have paid Tanner a bonus for the prorated period of that quarter (63/90 X $1000 = $700). The company paid Tanner nothing.

84. Tanner made demand upon BD LaPlace when he tried cashing his check issued by BD LaPlace.

85. Tanner also makes demand upon BD LaPlace for the payment of his bonus by way of this lawsuit in the amount of $700 due to Tanner.

86. BD LaPlace's actions in refusing to pay Tanner his unpaid wages for work done during the bonus period violated La. R.S. 23:631 which requires an employer pay its employees wages due upon discharge.

87. A penalty in a wage claim is calculated on the basis of the plaintiff's daily

earnings. Tanner earned $18.81/hr and worked 12-hour shifts.

88.  Tanner is entitled to penalties (up to 90 days wages dependent on the number of days since demand was made), attorney's fees, costs, interest, and $700 in lost wages from Defendant pursuant to La. R.S. 23:631-634.

## JURY DEMAND

89.   Paul J. Tanner is entitled to and demands trial by jury on his claims.

**WHEREFORE,** Plaintiff, Paul J. Tanner, respectfully requests this Court to enter a judgment in his favor and against Defendant as follows:

A.   Legal Relief

   (1)   Compensatory damages in whatever amount he is found to be entitled.

   (2)   Punitive damages in whatever amount he is found to be entitled.

   (3)   Back pay and front pay, including the value of fringe benefits lost.

   (4)   An award of interest, costs, and reasonable attorney fees and expert witness fees.

   (5)   Unpaid wages, penalty, costs, interests, and attorney fees for the wage claim.

B. Equitable Relief

   (1)   An order prohibiting illegal discrimination and retaliation.

   (2)   An order prohibiting Defendant from requiring its employees to undergo medical or psychological examinations without proof the examinations are job related and consistent with business necessity.

   (3)   Any equitable relief appropriate at final judgment.

**Respectfully submitted,**

BELL LAW FIRM, LLC
*/s/ Paul F. Bell*
Paul F. Bell (Bar #30391)

                                                    4949 Tulane Drive
                                                    Baton Rouge, LA  70808
                                                    Telephone: (225) 284-3235
                                                    Facsimile: 888-812-7933   bz9@cox.net
                                                     *Counsel for Plaintiff, Paul J. Tanner*

## SERVICE INFORMATION

Plaintiff has mailed on the 23rd of May 2017 via USPS certified mail a *Notice of Lawsuit and Request To Waive Service of a Summons,* two copies of the *Waiver of the Service of Summons,* and a stamped self-addressed envelope to the Defendant in care of its registered agent, C T Corporation System; 3867 Plaza Tower Dr., Baton Rouge, LA  70816.  Plaintiff also filed with this Court an unsigned summons.

                                            _____/s/ *Paul F. Bell*_____
                                          Paul F. Bell, Attorney for Paul J. Tanner